**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

NEW CINGULAR WIRELESS PCS, LLC d/b/a AT&T Mobility,

Plaintiff,

v.

THE INCORPORATED VILLAGE OF MUTTONTOWN, THE INCORPORATED VILLAGE OF MUTTONTOWN BOARD OF TRUSTEES; THE PLANNING BOARD OF THE INCORPORATED VILLAGE OF MUTTONTOWN, THE SITE AND ARCHITECTURAL REVIEW BOARD OF THE INCORPORATED VILLAGE OF MUTTONTOWN, and THE ZONING BOARD OF APPEALS OF THE INCORPORATED VILLAGE OF MUTTONTOWN

Defendants.

Civil Action No.

**COMPLAINT**

Plaintiff New Cingular Wireless PCS, LLC d/b/a AT&T Mobility, by way of Complaint against the Incorporated Village of Muttontown, the Incorporated Village of Muttontown Board of Trustees, the Planning Board of the Incorporated Village of Muttontown, the Site and Architectural Review Board of the Incorporated Village of Muttontown, and the Zoning Board of Appeals of the Incorporated Village of Muttontown (collectively, "Defendants"), hereby says:

## PARTIES

1. Plaintiff New Cingular Wireless PCS, LLC d/b/a AT&T Mobility ("AT&T") is a Delaware Limited Liability Company with its principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia 30319.

2. Upon information and belief, Defendant The Incorporated Village of Muttontown (the "Village") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at One 'Raz' Tafuro Way, Muttontown, NY 11791.

3. Upon information and belief, Defendant the Incorporated Village of Muttontown Board of Trustees (the "Board of Trustees") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at One 'Raz' Tafuro Way, Muttontown, NY 11791.

4. Upon information and belief, Defendant the Planning Board of the Incorporated Village of Muttontown ("Planning Board") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at One 'Raz' Tafuro Way, Muttontown, NY 11791.

5. Upon information and belief, Defendant the Site and Architectural Review Board of the Incorporated Village of Muttontown ("SARB") is a local government entity or instrumentality thereof duly constituted and established pursuant to New York law and having an office at One 'Raz' Tafuro Way, Muttontown, NY 11791.

6. Upon information and belief, Defendant the Zoning Board of Appeals of the Incorporated Village of Muttontown ("Zoning Board") is a local government entity

or instrumentality thereof duly constituted and established pursuant to New York law and having an office at One 'Raz' Tafuro Way, Muttontown, NY 11791.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as AT&T is asserting a claim arising under federal law, more particularly, 47 U.S.C. § 332(c)(7), enacted as part of the Telecommunications Act of 1996 (the "TCA").

8. This Court has supplemental jurisdiction over all other claims herein, pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy and are related to AT&T's claims under the TCA.

9. Venue is proper in this District under 28 U.S.C. § 1391(b), as the Defendants reside or may be found in this District, the property that is the subject of this action is located in this District, and the acts or omissions giving rise to this action occurred in this District.

10. Expedited review of this action is required pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

## FACTUAL BACKGROUND

### The Need for Reliable Access to AT&T's Services

11. AT&T is a provider of wireless services ("services") pursuant to licenses issued by the Federal Communications Commission (the "FCC").

12. AT&T provides services through an interlocking network of line-of-sight transceiver facilities ("wireless services facilities") that permit the efficient reuse of frequencies allocated to AT&T by the FCC.

13. The radio signals used by AT&T to provide services are subject to disruption caused by topography, foliage, and man-made structures, as well as to range limitations inherent in the use of low-powered signals that permit frequency reuse.

14. Reliable access to 911 and Enhanced 911 (E911) services by means of wireless devices is a particularly important public safety consideration given that 70% of 911 calls are made from wireless devices, and over half of households nationally no longer utilize landline telephone service.

15. Further accentuating the public safety significance of consistent and reliable access to AT&T's services, a portion of the frequencies licensed to AT&T are used to support FirstNet, a national public safety broadband network for first responders created pursuant to a statutorily and congressionally mandated public-private partnership between AT&T and the First Responder Network Authority.

16. Because of the need for reliable backup power to ensure availability of FirstNet service, an outdoor distributed antenna system ("ODAS") is not a suitable means to provide coverage to an area for FirstNet.

<u>The Unreasonably Protracted Application Process</u>

17. There is an area in the Village along and adjacent to a 2.7 mile stretch of Jericho Oyster Bay Road, including a 2.1 mile stretch of Northern Boulevard and a 1.6

mile stretch along Muttontown Road and Muttontown Eastwoods Road, where AT&T is unable to provide reliable access to services from its network (the "service gap").

18. The service gap is significant in terms of size, number of persons affected, and degree of service deficiencies.

19. The absence of a wireless services facility capable of providing reliable services to the service gap materially impairs AT&T's ability to engage in a variety of activities related to its provision of services covered by its FCC licenses.

20. There are no existing structures in the area of sufficient height to host an AT&T facility that would remedy the service gap.

21. Construction of a wireless services facility at One 'Raz' Tafuro Way, Muttontown, (the "Site") would permit AT&T to remedy the service gap.

22. The Site is currently owned by the Village and is the location of the Village Hall and other municipal offices.

23. The Site is municipal property located in the center of the service gap in an area otherwise consisting of single-family residential properties and the deed-restricted Muttontown Preserve.

24. AT&T prepared plans to locate a wireless services facility (the "Proposed Facility") at the Site.

25. The Proposed Facility is a "stealth" wireless services facility involving the mounting of twelve antennas (four per sector) at a centerline height of 150 feet above ground level ("AGL") on a monopole with simulated pine branch camouflage (a

"monopine"), with a total height, including camouflage branches, of approximately 165 feet AGL.

26. The Proposed Facility's monopine is designed to accommodate collocation of two additional providers beneath AT&T's antennas.

27. The Board of Trustees approved the design of the monopine.

28. On or about July 8, 2020, the Board of Trustees adopted Resolution 20-79 authorizing the Village, through its Mayor, to enter into a lease with AT&T (the "Lease"), which was then executed December 22, 2020, permitting AT&T to construct, operate and maintain the Proposed Facility.

29. The Lease provides that AT&T's use of the Site is contingent on obtaining all governmental approvals necessary to construct, operate, and maintain the Proposed Facility (the "Government Approvals").

30. The Lease further provides that the Village will reasonably assist AT&T with applications for the Government Approvals and in obtaining and maintaining the Government Approvals.

31. Under § 190-75 of the Code of the Village of Muttontown ("Village Code") the Proposed Facility requires a Special Use Permit from the Board of Trustees.

32. Under Village Code § 190-9, the Proposed Facility also requires relief from the Planning Board to permit an increase in the height of the monopine above 150 feet AGL to make the camouflage at the top of the monopine more effective, and other relief that is related to existing non-conformities at the Site and would not be needed if the

Site was one lot, but is technically required because the Site involves four contiguous Village-owned lots.

33. On March 10, 2021, AT&T submitted an initial application for the Proposed Facility which, after receipt of comments from the Village Building Department, was withdrawn without prejudice on August 25, 2021 to permit AT&T to address comments raised by the Village.

34. On October 12, 2021, AT&T submitted its new application for a Special Use Permit from the Board of Trustees, for modifications of dimensional requirements from the Planning Board pursuant to Village Code § 190-9, and a building permit from the SARB (the "Application").

35. The Application included a narrative explaining the factual and legal grounds supporting approval of the Application, and a site plan of the Proposed Facility.

36. The Application also included a structural analysis and engineering letter documenting that the Proposed Facility would meet or exceed all applicable structural requirements.

37. The Application included a zoning, planning, and visual impact analysis documenting the minimal impact of the Proposed Facility.

38. The Application included an affidavit from a radio frequency engineer documenting the existence of the service gap and that the Proposed Facility would remedy it.

39. The Application included a certification of compliance with FCC regulations.

40. The Application included confirmation that the Proposed Facility did not require registration with the FAA.

41. The Application included a Long Environmental Assessment Form and supporting information documenting that the Proposed Facility would not have a significant adverse environmental impact pursuant to the State Environmental Quality Review Act ("SEQRA"). Finally, the Application included a building permit application.

42. The filing of the Application commenced the running of the 150 day "Shot Clock" under 47 C.F.R. § 1.6003(c), (e), defining the reasonable time within which all Defendants were required to render their decision on the Application.

43. On October 29, 2021, the Village requested supplementation and clarification of certain materials in the Application. Under 47 C.F.R. § 1.6003(d), this request tolled the running of the Shot Clock until AT&T responded to the request.

44. On December 7, 2021, after meeting with the Village on November 2, 2021 to discuss the Village's October 29, 2021 request, AT&T responded to the Village's October 29, 2021 request with additional materials, including an analysis documenting the absence of any viable alternate sites. Under 47 C.F.R. § 1.6003(d)(3), AT&T's response resumed the running of the Shot Clock subject to Defendants, within 10 days of the submission of the supplemental response, giving notice of any deficiency in that response.

45. Defendants provided no notice of any deficiency with AT&T's December 7, 2021 response within 10 days of the submission of that response.

46. Due to the absence of any timely notice of any deficiency with AT&T's December 7, 2021 response, the Shot Clock continued running and was set to expire on April 18, 2021.

47. On numerous occasions, including December 7, 2021, December 22, 2021, January 13, 2022, February 9, 2022 and March 22, 2022, AT&T reminded Defendants that the Shot Clock would expire on April 18, 2021.

48. On numerous occasions, including December 7, 2021, December 22, 2021, January 13, 2022, February 9, 2022, March 3, 2022, March 22, 2022, and April 15, 2022, AT&T requested that Defendants hold whatever hearings would be necessary to act and make all necessary determinations on the Application before the Shot Clock expired.

49. On January 7, 2022, Mr. Keith Corbett, the Village Counsel, requested additional information concerning the Application. Under 47 C.F.R. § 1.6003(d)(3), this request was not timely and had no impact on the Shot Clock expiration date.

50. In response to Mr. Corbett's request, AT&T, by letter dated January 13, 2022, provided the requested information, while restating AT&T's demand that hearings on the Application be completed by the April 18, 2022 Shot Clock expiration date.

51. In response, Mr. Corbett made a verbal demand to AT&T's land use counsel that the January 13, 2022 letter be revised to concede that the Application was "now complete" only as of that date, and to omit any claim that the Shot Clock began to run on any earlier date, or that it would expire on April 18, 2022. AT&T's land use

counsel refused to comply with this demand, which was contrary to the facts, ignored governing law, and was prejudicial to AT&T's rights.

52. On February 9, 2022, Mr. Corbett again called AT&T's land use counsel, stating that he would "send back" the January 13, 2022 letter, and again requested in its place that AT&T provide a letter conceding that the application was only "now complete," and to omit any claim that the Shot Clock began to run on any earlier date, or that it would expire on April 18, 2022. AT&T's land use counsel advised Mr. Corbett that sending back the January 13, 2022 letter would not delete it from the administrative record, and instead responded with a letter requesting hearings on the Application, and asserting that "[p]ursuant to federal regulation, the Application is subject to a 150 day Shot Clock, which will expire on April 18, 2022, at which time, absent any extension, the Village must issue determinations on all approvals requested in the application."

53. The Village records contain a letter from Mr. Corbett to AT&T's land use counsel, dated March 22, 2022, falsely asserting that "as referenced in your correspondence, the complete application was not filed with the Village until February 9, 2022. Therefore, the FCC Shot Clock did not commence until February 9, 2022."

54. AT&T only became aware of Mr. Corbett's March 22, 2022 letter as a result of the Acting Village Clerk sharing a copy with AT&T on March 31, 2022.

55. Mr. Corbett's March 22, 2022 letter misrepresented both the operative submission date for the Application as well as the contents of AT&T's February 9, 2022 letter. In particular, the March 22, 2022 letter created a false record that AT&T agreed

with Mr. Corbett's material misstatements of law and fact when, in fact, AT&T's land use counsel had twice expressly declined to do so.

56. The position asserted in the March 22, 2022 letter also manufactured a pretext for delay. Mr. Corbett's January 7, 2022 request for additional information had no effect on the April 18, 2018 Shot Clock expiration date. Timing under the Shot Clock is governed by when the application is filed, not when a municipality elects to consider an application complete. The FCC has made clear that "the shot clock begins to run when the application is proffered. In other words, the request is 'duly filed' at that time, notwithstanding the locality's refusal to accept it." *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, Declaratory Ruling and Third Report and Order*, WT Docket No. 1779, WC Docket No. 17-84, FCC-18-133 ¶¶ 144, 145 (September 27, 2018) ("Declaratory Ruling"). The request would not have even tolled the Shot Clock under 47 C.F.R. § 1.6003(d), as it was made more than ten days after AT&T's December 7, 2022 response to the Village's request for additional information. Furthermore, the information sought either had already been provided or fell outside the scope of the Village's October 29, 2021 request.

57. On March 30, 2022, the Acting Town Clerk, for the first time, notified AT&T that Defendants were taking the position that AT&T would have to seek variances from the Zoning Board for certain relief that the Board of Trustees could grant as waivers from Special Use Permit requirements under Village Code § 190-79, and/or that the Planning Board could grant under Village Code § 190-9 as modifications of dimensional requirements.

58. If the Board of Trustees believed that it did not have the authority to provide the relief requested in the form of waivers, there was no reason for its failure to have advised AT&T of this position in response to AT&T's March 10, 2021 initial application, or the October 12, 2021 Application.

59. The Defendants' assertion, nineteen days before the Shot Clock was due to expire, of the newly claimed need for Zoning Board proceedings created further delay.

60. In an April 7, 2022 telephone conference with representatives of AT&T, Mr. Corbett and others on behalf of Defendants again required that AT&T seek variances from the Zoning Board, but agreed to place the variance application on the agenda for the May 19, 2022 Zoning Board meeting.

61. On April 15, 2022, AT&T, while disagreeing with the claimed need for separate proceedings before the Zoning Board, submitted a request for variances to the Zoning Board, and indicated its willingness to extend the Shot Clock for a limited period of time.

62. AT&T and Defendants subsequently agreed to extend the Shot Clock through May 19, 2022.

63. Following the May 19, 2022 hearing, after a period of negotiation, on June 14, 2022, the parties agreed to extend the Shot Clock through August 19, 2022, with Defendants agreeing to either approve or deny AT&T's Application, including each and every approval requested therein, on or before that date.

64. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, Defendants made no request for radio frequency ("RF") drive test data of the service gap.

65. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, Defendants made no request for RF data on all five of the bands AT&T operates.

66. As signals in AT&T's lowest frequency band, 700 MHz, propagate farther than signals in higher frequency bands, if there is a gap in service from existing facilities at 700 MHz, that gap will only be larger in higher frequency bands.

67. AT&T's RF proofs showed a gap in service from existing facilities at 700 MHz.

68. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, and having had advance notice of the balloon test, Defendants never required that a crane rather than balloons be used to determine the places from which the Proposed Facility could be seen.

69. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, Defendants made no request for formal documentation that the Muttontown Preserve, a County-owned nature preserve, is unavailable for commercial development.

70. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, Defendants made no request that

AT&T document the unavailability and/or unsuitability of an ODAS system to remedy the gap.

71. Despite having had the Application for over ten months prior to the Zoning Board's July 21, 2022 vote to deny the Application, Defendants made no request that AT&T, in applying for a third priority site under the strict priority scheme under Village Code § 190-58, disregard the priority scheme and document the unavailability and/or unsuitability of lower priority sites, or sites not on the priority list, such as non-residential properties at the intersection of Routes 25A and 106.

72. On July 21, 2022, the Zoning Board held a second hearing on the Application.

73. The hearing record on the Application does not contain substantial evidence that AT&T currently provides reliable service in the service gap.

74. The hearing record on the Application does not contain substantial evidence that the Proposed facility would not be minimally intrusive, or that any potential alternative would be available, or suitable, or less intrusive, or otherwise more feasible.

75. The hearing record on the Application does not contain substantial evidence of the existence of any viable, available, less intrusive, or more feasible alternate means to remedy the service gap.

76. The hearing record on the Application does not contain substantial evidence that the Crown Castle ODAS would be available for AT&T's use, suitable for AT&T's services, including FirstNet, would remedy the service gap, or, in the

aggregate, be minimally intrusive, or less intrusive, or otherwise more feasible, than the Proposed Facility.

77. The hearing record on the Application does not contain substantial evidence that AT&T could remedy the service gap with multiple facilities located in other municipalities, or that such a multi-facility system, in the aggregate, would be available, viable, minimally intrusive, less intrusive, or otherwise more feasible than the Proposed Facility.

78. The Zoning Board did not ask the AT&T radio frequency expert present at the meeting about the viability of ODAS, or other multi-site solutions, which are disfavored under the Village Code.

79. The hearing record on the Application does not contain substantial evidence that restrictions on development in the Muttontown Preserve could be overcome to erect a wireless facility there, or that a wireless facility in the Muttontown Preserve would be available, or suitable, or minimally intrusive, or less intrusive, or otherwise more feasible, than the Proposed Facility.

80. The hearing record on the Application does not contain substantial evidence that a facility in any of the areas qualifying as first priority locations under Village Code § 190-58 would remedy the service gap, or would be available, or suitable, or minimally intrusive, or less intrusive, or otherwise more feasible, than the Proposed Facility.

81. The hearing record on the Application does not contain substantial evidence that a facility in any of the areas qualifying as second priority locations under

Village Code § 190-58 would remedy the service gap, or would be available, or suitable, or minimally intrusive, or less intrusive, or otherwise more feasible, than the Proposed Facility.

82. The hearing record on the Application does not contain substantial evidence that the Proposed Facility does not qualify as a third priority location under Village Code § 190-58.

83. The hearing record on the Application does not contain substantial evidence that the Proposed Facility would be on land dedicated as parkland.

84. The Zoning Board declined to hear testimony from the engineer who prepared the site plan drawing that the Zoning Board misinterpreted as indicating the Proposed Facility would be on land dedicated as parkland.

85. The Village had advised AT&T, prior to submitting the Application, that the Proposed Facility would not be on land dedicated as parkland.

86. At the July 21, 2022 hearing, the Village's counsel falsely stated that the Village had not advised AT&T that the proposed facility would not be on land dedicated as parkland.

87. Under *Friends of Shawangunks v. Knowlton,* 64 N.Y.2d 387, 392 (1985) a zoning application cannot be denied because the proposed use would be in violation of a deed restriction.

88. At the July 21, 2022 meeting, the Zoning Board voted to deny the Application, but did not issue the written denial required by the TCA.

89. On July 22, 2022, AT&T requested that the Acting Town Clerk advise it when the written denial required by the TCA would be issued and provide AT&T a copy of the written denial when it was issued. He agreed to do so.

90. On July 27, 2022, August 8, 2022, August 18, 2022, and August 30, 2022, AT&T made inquiries to the Acting Town Clerk about the status of the written denial and requested that the Acting Town Clerk provide AT&T a copy of the written denial when it was issued.

91. On September 8, 2022, the Acting Town Clerk provided AT&T a copy of the written denial.

92. While the written denial, a true copy of which is annexed hereto as Exhibit 1, is dated August 17, 2022, it was not mailed to AT&T within five days of its date as required by N.Y. Village Law 7-712-A(9), and there is no record of a Zoning Board public meeting on that date, or on any date between the July 21, 2021 vote to deny the Application, and when the written denial was e-mailed to AT&T on September 8, 2022.

**Count I**

93. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

94. Under 47 U.S.C. § 332(c)(7)(B)(ii), the TCA requires zoning, land use, and other state or local permitting decisions relating to wireless facility siting requests to be rendered within a reasonable period of time.

95. The TCA provides that for an application for a new stand-alone facility, the presumed reasonable period of time to render a decision is within 150 days after submission of the application for that facility, unless extended by consent. 47 C.F.R. § 1.6003(c)(1)(iv).

96. The last extension of the Shot Clock for the Application expired August 18, 2022.

97. The Zoning Board did not adopt the written denial dated August 17, 2022 at a public meeting.

98. The Board of Trustees, the Planning Board, and the SARB all failed to take any action on the Application within a reasonable period of time, or prior to expiration of the Shot Clock.

99. Defendants failed to meet their duty under 47 U.S.C. § 332(c)(7)(B)(ii) to render zoning, land use, and other state or local permitting decisions relating to wireless facility siting requests within a reasonable period of time through the combined effect of their actions, including but not limited to:

a) refusing to schedule any meeting by any Defendant on the Application until after the Shot Clock would have expired;

b) attempting to coerce AT&T into falsely stating that the Shot Clock did not begin to run until February 2022;

c) requesting that AT&T acquiesce in a falsification of the Application record that would have negated the true record that the Shot Clock began to run in October 2021;

d) retaliating against AT&T's refusal to acquiesce in falsification of the Application record with a belated interpretation of the Application requiring time-consuming hearings and approval by an additional body;

e) insisting on a procedure requiring the Application to be reviewed and approved by each Defendant sequentially and over an extended period of

time, without concern for Defendants' obligation to resolve the Application in a reasonable period of time;

f) the Board of Trustees, the Planning Board, and the SARB's failure to act on the Application; and

f) the Zoning Board "sandbagging" AT&T by dating the written denial August 17, 2022, despite the absence of any public meeting on that date to adopt it, and then not disclosing it until September 8, 2022, thereby concealing it for twenty-one days of the thirty-day statute of limitations for asserting a claim under the TCA.

**<u>Count II</u>**

100. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

101. 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a) prohibit denial of an application for a facility where denial of that application would prohibit or have the effect of prohibiting the provision of covered services.

102. In its *Declaratory Ruling,* the FCC, pursuant to legislative authority, definitively interpreted 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a) to provide that "an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities." *Declaratory Ruling* at ¶ 37.

103. The failure to approve the Proposed Facility materially inhibits AT&T's activities related to its provision of covered services, as it has obstructed AT&T's ability to permit its customers in the service gap to access covered services consistently and

reliably. In addition, the ability of first responders to access FirstNet services is also compromised.

104. AT&T made a good faith effort to identify and evaluate less intrusive alternatives to remedy a significant service gap, and the Proposed Facility is the least intrusive means of providing consistent and reliable access to AT&T customers and FirstNet users in the service gap.

105. Under 47 U.S.C. § 332(c)(7)(B)(i)(II) and 47 U.S.C. § 253(a), Defendants' actions have the effect of prohibiting the provision of covered services in the area intended to be served.

## Count III

106. AT&T incorporates the paragraphs set forth above as if set forth at length herein.

107. 47 U.S.C. § 332(c)(7)(B)(iii) requires that "any decision by a State or local government or instrumentality thereof to deny a request to place, construct or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

108. Under New York law, AT&T, as a provider of wireless services seeking approval of the Proposed Facility, is entitled to the same zoning preference enjoyed by public utilities, and need only establish that there is a service gap, that the location of the Proposed Facility will remedy that service gap, and that the needs of the broader public, on balance, would be served by granting approval of the proposed facility.

109. The written record of the proceedings before the Zoning Board establishes the existence of the service gap in the area to be served by the Proposed Facility, that the Proposed Facility would remedy that service gap, and that the needs of the broader public, on balance, would be served by granting approval of the Proposed Facility.

110. To the extent required by law, the written record of the proceedings before the Zoning Board also establishes that the Proposed Facility is minimally intrusive, and is the most feasible means of remedying the service gap.

111. The record does not contain substantial evidence supporting the Zoning Board's denial of the site plan application for the proposed facility.

**Count IV**

112. New York Town Law § 274-b(6) required the Zoning Board to hold a public hearing on the Application for a special use permit within sixty-two days from the day the Town received the Application.

113. The Zoning Board failed to hold a public hearing on the Application for a special use permit within sixty-two days from the day the Town received the Application, and the Board of Trustees, Planning Board, and SARB failed to hold any hearings on the merits of the Application.

114. The Zoning Board's written decision was not mailed to AT&T within five days of its date, as required by N.Y. Village Law 7-712-A(9).

115. The Proposed Facility complies with all applicable requirements of the Town Code, other than a modest increase in height to maximize the effectiveness of the

monopine camouflage, and *de minimis* modification of dimensional requirements due to the Site consisting of four separate lots.

116. Failure to approve the Proposed Facility in a timely manner was arbitrary, capricious, unreasonable, and an abuse of discretion in violation of State law including, but not limited to, CPLR Article 78.

**WHEREFORE**, Plaintiff AT&T requests judgment against the Defendants as follows:

A. Expedited disposition of this action pursuant to 47 U.S.C. § 332(c)(7)(B)(v);

B. Entry of an Order directing Defendants to grant all variances, permits, and approvals necessary to allow construction, operation, and maintenance of the Proposed Facility for violation of 47 U.S.C. § 332(c)(7)(B)(ii);

C. Entry of an Order directing Defendants to grant all variances, permits, and approvals necessary to allow construction, operation, and maintenance of the Proposed Facility for violation of 47 U.S.C. § 332(c)(7)(B)(i) (II) and 47 U.S.C. § 253(a);

D. Entry of an Order directing Defendants to grant all variances, permits, and approvals necessary to allow construction, operation, and maintenance of the Proposed Facility for violation of 47 U.S.C. § 332(c)(7)(B)(iii);

E. Entry of an Order directing Defendants to grant all variances, permits, and approvals necessary to allow construction, operation, and maintenance of the proposed facility for violation of New York Town Law § 274-b(6) and New York Civil Practice Law & Rules § 7801 *et seq.*; and

F. Such other relief as this Court may deem equitable and just.

Respectfully submitted,

By: *<u>/s/ Andrew B. Joseph</u>*
Andrew B. Joseph

FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Tel.: (212) 248-3148
Fax: (212) 248-3141
Andrew.Joseph@faegredrinker.com